1              THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF SOUTH CAROLINA
                    CHARLESTON DIVISION
3

   IN RE:                        :
4  M.I. WINDOWS AND DOORS, INC.  :
   PRODUCTS LIABILITY LITIGATION :    2:12 MN 1
5

6

7

8

9

10

         Status Conference held Wednesday, September 19, 2012,
11

   commencing at 1:36 p.m., before the Hon. David C. Norton,
12

   in Courtroom II, United States Courthouse, 81 Meeting St.,
13

   Charleston, South Carolina, 29401.
14

15

16

17

18

19

20

21

22          REPORTED BY DEBRA LEE POTOCKI, RMR, RDR, CRR
                         P.O. Box 835
23                   Charleston, SC  29402
                       843/723-2208
24

25

1                        A P P E A R A N C E S

2

3    APPEARED FOR HOMEOWNER PLAINTIFFS:

     JUSTIN O. LUCEY, ESQ. and HARPER L. TODD, ESQ.,
4    P.O. Box 806, Charleston, SC.

5    DANIEL K. BRYSON, ESQ., 900 W. Morgan St., Raleigh, NC.

6    ALYSON L. OLIVER, ESQ., 950 W. University Dr., Rochester, MI.

7    JORDAN L. CHAIKIN, ESQ., 3301 Bonita Beach Road,
     Bonita Springs, FL.
8
     JONATHAN SHUB, JR., ESQ., 1515 Market St., Philadelphia, PA.
9
     SRIVATSA V. GUTPA, ESQ., 2220 Bonaventure Court, Alexandria,
10   VA.

11

12   APPEARED FOR DEFENDANT MI WINDOWS AND DOORS:

13   RICHARD A. FARRIER, ESQ., 134 Meeting St., Charleston, SC.

14   ANNIE ZAFFUTO, ESQ., CAROL LUMPKIN, ESQ. and
     LINDSEY B. LAZOPOULOS, ESQ., 200 S. Biscayne Blvd., Miami, FL.
15
     STEVEN W. OUZTS, ESQ., P.O. Box 1473, Columbia, SC.
16
     PATRICK J. PERRONE, ESQ., One Newark Center, Newark, NJ.
17
     CURTIS J. SHIPLEY, ESQ., 333 North Greene St., Greensboro, NC.
18
     THOMAS J. SMITH, 210 Sixth Avenue, Pittsburgh, PA.
19

20
     APPEARED FOR LAKES OF SUMMERVILLE:
21
     JASON A. DAIGLE, ESQ., P.O. Box 12579, Charleston, SC.
22
     KATIE McELVEEN, ESQ., H. BLAIR HAHN, ESQ. and
23   CHRISTIAN A. MARCUM, ESQ., 1037 Chuck Dawley Blvd.,
     Mt. Pleasant, SC.
24

25

1          THE COURT:  I've got CMO-3; I appreciate y'all

2     agreeing on that one, so we'll enter that order.  We'll enter

3     CMO-3.  Okay?  Any objection to that?

4          MR. BRYSON:  No, Your Honor.  That's all I had.

5          MR. FARRIER:  Your Honor, this is Tom Smith, a

6     partner of mine out of Pennsylvania, who I don't know if --

7          MR. SMITH:  No, Your Honor, we negotiated long and

8     hard with plaintiffs on CMO-3, and happy to say that just

9     about an hour ago we finished it up.  So we're happy to be

10    able to present it.

11         THE COURT:  Great.  So we'll enter that, all right?

12         MR. BRYSON:  Your Honor, Dan Bryson for the

13    plaintiffs, and Justin Lucey.  We would suggest that we go to

14    CMO-2.  And over the last couple of hours we've made

15    significant progress on ironing out some of our differences on

16    that, and if we could approach the bench and give you an

17    additional color-coded copy of that.

18         THE COURT:  Thanks for the color-coded copy, it does

19    make it a lot easier for us to figure out where the

20    competing -- But next time, after having read it

21    electronically yesterday and earlier this morning, I finally

22    got around to reading the footnote, so next time make a big

23    red arrow to say the footnotes are important this time, all

24    right?  But I got them.

25         MR. BRYSON:  Your Honor, going into CMO-2, with

1    regard to really trying to set forth a lot of procedures with

2    regard to obviously discovery, how we're going to proceed with

3    discovery, we have eliminated the fact sheet profile sheet

4    section.  We thought that would be helpful, but there was

5    objection to that, so we took that out.  That was probably the

6    most significant change from the version that you have.  So

7    really just going to the colored portion, yellow, again, are

8    suggestions that we think should be in there; blue for MI;

9    green, it's a contractor section that Mr. Hahn can address.

10   And it is color coded, that means one or two of the parties

11   disagree to that particular language.  The red language that

12   you have in front of you now indicates those areas where we

13   have reached a tentative agreement.

14       I might add that -- so the first fundamental issue that we

15   have, Your Honor, is how to proceed with discovery.  And

16   really going to Section D, master written discovery by

17   homeowner and contractor plaintiffs.  You know, it is our

18   position that we would, as a homeowner group representing

19   homeowners in multiple states, would have specific discovery

20   that we would like to provide to the defendant MI.

21       Indeed, we've agreed to give them a master set of our

22   discovery by next Friday, and to move that process along.  A

23   lot of that discovery, quite candidly, will mirror a lot of

24   discovery that was already served in the underlying case, but

25   we're refining it.  But to large extent it will be discovery

1    that's already been sent, seen and provided to MI and

2    addressed.  But that's neither here nor there.  We will have

3    that by next Friday.

4         THE COURT:  Does that mean the day after tomorrow or

5    a week from day after tomorrow?

6         MR. BRYSON:  I think a week from day after tomorrow.

7    The issue -- there is some issue with regard to how many

8    document requests can we have, including subparts.  But

9    fundamentally, Your Honor, there is a problem with do we get

10   to have a set of discovery, the contractor get to have a set

11   of discovery, and then MI has to answer both sets of

12   discovery.  We certainly, again, want to have our own

13   particular set of discovery, and think that the contractors

14   may have their own set of discovery.  After they see ours,

15   we'll have ours within ten days, and they can decide if that's

16   duplicative of what they were thinking, or if they have some

17   additional questions.

18   Certainly any documents that are produced, information

19   that's produced, answers that are produced, they would have

20   access to that information.  But that's a fundamental problem

21   that the parties have now, that we've not been able to

22   overcome that hurdle, is MI, and they can certainly state

23   their own position on it, thinks it ought to be just one set

24   of discovery from both parties; we think it should be two sets

25   of discovery, and feel pretty strongly about that.  And that

1    really is the issue.

2        Does Your Honor want to have them address each position as

3    we move along, and those --

4            THE COURT:  Probably easier to get it.  What about

5    the contractors, Mr. Hahn?

6            MR. HAHN:  Thank you, Judge.  If I may, the issue

7    that Mr. Bryson's touched on flows through this entire

8    document.  And that issue is, at the last status conference

9    Mr. Lucey said that he believed that 89 percent of the

10   discovery was done and he just needed a little bit and was

11   ready to go.  I understand that position that he has.  That

12   creates a conflict with this MDL moving forward.

13           THE COURT:  I think the basic question is, do you

14   agree with Mr. Bryson that you want your own separate set of

15   discovery?

16           MR. HAHN:  No, sir, Your Honor.  What I think we

17   ought to have is what the MDL process calls for and the manual

18   calls for is we have joint discovery.  However, I understand

19   their concern.  And they don't want to sit and wait, they

20   don't want to share what they've already got in the bag with

21   us, and they don't want to sit around waiting for us to catch

22   up before the case moves forward, which creates the conflict.

23   And I, quite frankly, don't know how to deal with it.  And it

24   flows not only with requests to produce, it will be

25   interrogatories, it will be depositions, and all the way

1    through this process.  And I apologize to the Court for even

2    putting this forward, but I am at a loss, Judge.

3              MR. FARRIER:  Your Honor, and this is -- I do agree

4    that this is -- we have a fundamental issue which transcends

5    everything that we're here to discuss today.  It's our

6    position and the position of the Manual on Complex Litigation,

7    that the MDL process should be a coordinated process.  And

8    it's been difficult for to us have discussions about where

9    we're going with some of this, because we can't get everyone

10   under the same tent in that regard.

11       You know, we would prefer, and I think the rules and the

12   philosophy of an MDL anticipate that there would be

13   efficiencies brought to the process as a result of the MDL,

14   that for whatever discovery tool is being used, there would be

15   some coordination on this side, on this side of the table, as

16   the two PSCs seek to build their own cases, they're

17   coordinating what they're doing, and we're responding to a

18   consolidated managed set of discovery.  And we're not there at

19   present.  And as has just been stated, I'm not sure where to

20   go with that.  I don't know whether a mediation of sorts is in

21   order.

22              MR. BRYSON:  Your Honor, if I might add, and just a

23   few more comments.  Mr. Hahn's comments are much more

24   overarching than the issue I was addressing with regard to

25   discovery.  We have agreement, for example, with MI and with

1   Mr. Hahn's agreement on the number, that there will be, I

2   don't know, 25 depositions taken of certain number of

3   witnesses.  You know, certain that the duration of those

4   depositions, we've negotiated that on how long they would be.

5   Absolutely and certainly, before those depositions of an MI

6   representative, we will meet with Mr. Hahn and agree to who

7   goes first, how much time do you guys need, how much time do

8   we need, do you want to go first on this one, we'll go first

9   on the next one, they've produced all these documents, let's

10  look at the documents and let's make a decision on this

11  particular witness.  We have no problem, and we're stating

12  that for the record that we agree that coordination's

13  necessary.  But we're talking about with regard to a discovery

14  request that we have.  We have a specific set of homeowner-

15  related discovery that we want to ask, as Your Honor has heard

16  through two days of hearings, and again, based on how Your

17  Honor rules, there's a number of questions and things we have

18  to explore and answer to prove the various legal causes of

19  actions that we have.  And then I guess going into the more

20  fundamental issue that will come up in just a few minutes,

21  perhaps, is when these documents are produced, and they'll

22  produce them into a CD, we want to code these documents

23  ourselves in a proprietary way among the homeowner plaintiff

24  group.  Because we have a number of issues that we've learned

25  from experience that manufacturers don't think there's a

1    problem with their product, and they look to blame it on

2    contractors for installation, they blame it on homeowners for

3    maintenance, you know, they have a number of defenses that

4    manufacturers assert.  We would be having, as we go through

5    documents, we will be coding them.  And even now I feel like

6    I'm revealing kind of some of our work product, but I think

7    that it's necessary that we have things that we're looking at,

8    that we code the documents that we think that we have a right

9    to keep that type information confidential.

10    Because even one day down the line, there's a resolution

11    of this case, there could be contractor claims, you know, we

12    heard that come up from Mr. Perrone when he argued, you know,

13    you guys just need to be going and filing a lawsuit against

14    the builder.

15    Who knows what we may do one day, except that with regard

16    to the documents that are produced to us, these would be

17    documents that could be shared by them.  Nobody is saying keep

18    the documents to themselves.  It's just with regard to our

19    coding of our documents that we would want to do that and keep

20    that proprietary to ourselves.  But we have no problem sharing

21    the information that's produced by MI with Mr. Hahn, and then

22    coordinating discovery.

23    So I don't really see where the problem is.  We have right

24    now ten different pending lawsuits that we're having to do

25    discovery on.  And we're just asking, you know, that we be

1    able to submit a set of master discovery for all ten of those

2    states, and that we do that in a manner that we would produce

3    by -- we would have ready by next Friday.

4            THE COURT:  All right.

5            MR. HAHN:  Your Honor, if he's going to make a

6    representation on the record, we're relying on that, and we'll

7    deal with other issues as they come up.

8            THE COURT:  So you don't have any problem with the

9    homeowners committee keeping proprietary their coding of the

10   documents with regard to their claims?

11           MR. HAHN:  No, sir, we talked about that.  That a

12   larger issue with that is, which we'll just have to work

13   through, is they want their own depository of the database.

14   And so we'll have two databases.  And there will be some, I

15   expect, problems, because of technology, that one database

16   didn't want the documents, the other one does.  Through

17   nobody's fault, it's just going to happen, and we'll have to

18   deal with how to handle that.

19           THE COURT:  But you're not saying that Document A is

20   going to be Document A in your database and Document A in your

21   database and Document A in your database; you're not putting

22   different numbers on them, are you?

23           MR. HAHN:  I would hope not, Your Honor.

24           THE COURT:  I would hope not, too, because if you do,

25   I'll shoot every one of you.

1          MR. HAHN:  Yes, sir.

2          THE COURT:  So, yes, sir.

3          MR. FARRIER:  Your Honor, this is really a

4  significant concern of ours.  The argument for the JPML was

5  that we want to have consolidated process for discovery.  It

6  creates an incredible mine field for us to have to segregate

7  what we're doing in terms of discovery.  Whatever database is

8  produced in response to a master set of discovery, needs to be

9  a single database.  What happens in terms of splitting that up

10  after it's produced, we don't really care.  But the production

11  has got to be the same.  The attorney-client privilege

12  analysis as to specific documents has to be the same and

13  consistent, so that there are common rulings.  Otherwise,

14  we've got a bifurcated MDL.

15          MR. BRYSON:  You know, I don't get it.  Aren't they

16  going to -- they're going to produce documents, and any

17  documents you produce pursuant to our discovery requests, Mr.

18  Hahn gets a copy of it.  You produce them -- I think you have

19  the opportunity on DVDs or CDs, however you want to produce

20  them, you make a single Bates stamp on your documents when you

21  produce them.  We give a copy to him so he can code them the

22  way he wants, we have them, we code them the way we want on

23  the issues we think are important, and we're all on the same

24  page.

25      And if you produce documents that are specifically

1    responsive to his discovery requests, we get a copy of them,

2    we have them.  We're all -- you're not having to do things --

3    I don't understand any duplicate fashion.

4         MR. FARRIER:  I don't know how to say this other than

5    to do it sort of visually.  As long as we are producing one

6    time sort of on that side of the room, what happens after it

7    goes on that side of the room, we don't care about.

8         There's a technical issue about whether or not there's a

9    common database to start out with, and whether that's

10   segregated or not.  But it creates difficulty if no one knows

11   which document is being -- has actually been produced.  As

12   long as we all, including the Court, can, with confidence, say

13   yes, this document was produced, or this privilege was claimed

14   on this specific day on this specific basis, then that's a

15   system we can work with.

16        THE COURT:  Okay.  So you and your documents, you're

17   going to Bates stamp, I guess, each of your documents, right?

18        MR. FARRIER:  Yes.

19        THE COURT:  And those Bates stamped defendants'

20   documents are going to be produced to whatever, to a master

21   place.  Everybody is going to have the same documents that you

22   produce, then you're going to access them and use your coding,

23   and you're going to access them and use your coding.

24        MR. FARRIER:  Correct.

25        MR. HAHN:  I'm sorry, Judge, they're talking about

1    two separate databases.  Complete.  So --

2           THE COURT:  Who's talking about two separate

3    databases?

4           MR. HAHN:  The homeowners.  I thought we'd have one

5    database, and I'd access them separately, us my coding, they'd

6    access them separately using their coding.  That's not what

7    they're interested in.  They want two separate databases.

8           MR. BRYSON:  I think that's another issue, Judge.

9    We're talking about the documents would be produced.  We have

10   a hard drive that the documents were loaded into with a

11   program, a proprietary program, I think we're going to use

12   Concordance, that we code and use our issues and we'll go at

13   it.

14       The storage mechanism for it is not, you know, that's not

15   very expensive.  They would get the documents.  As I

16   understand it, Mr. Hahn is going to use a company called ILS.

17   And quite candidly, we talked to ILS, they're a lot more

18   expensive than what we were willing to spend the money on.

19   But we have a law firm that's involved as part of our PSC,

20   they have access to the proprietary Concordance database,

21   which is well known and well used, and that's what we wanted

22   to use.

23       So the software to code is what's different, and they have

24   it, the documentation, there will be a consistency of the

25   documents that are produced and they're not going to get

1    conflicting Bates numbers or anything of that nature.

2              THE COURT:  Well, let's start step one.  Mr. Farrier

3    is worried about having to produce -- all he wants to do is

4    produce them one time to wherever it's going to go.  Right?

5    Do you have any problem with that?

6              MR. BRYSON:  Do not.  They're producing it on a DVD.

7              THE COURT:  Do you have any problem with that?  All

8    he's doing is producing it one time.

9              MR. HAHN:  No, sir.

10             THE COURT:  Okay.

11             MR. FARRIER:  There was a little bit of a caveat

12   there.  Assuming a single document depository.  And the way I

13   would look at it visually is as we produce, we're going to put

14   it in the barn.  Those guys can work out access to the barn,

15   what they can take out of the barn, who sees what is being

16   taken out.  So that if there's a question later on in a

17   deposition, as a practical matter, somebody says, I've never

18   seen this document before, we can go to the barn and prove

19   that it's there.

20             MR. BRYSON:  There's been some negotiations that are

21   actually in the ESI order that may contravene a bit what I

22   just said; Mr. Lucey wants to address that.

23             THE COURT:  Okay.

24             MR. HAHN:  If I may, Judge, one way that might deal

25   with this is ILS is a third-party vendor.  If the defendants

1    dump all the documents into ILS' database, then the homeowners

2    can go, can be notified, we just got a dump, they can go to

3    that database and get them.  And everything is out of that

4    database they get it.  Then they can put it on Concordance or

5    whatever they want to do with it, and it's there.  And we can

6    deal with the cost of -- that little bit of storage is

7    minimal, and they can deal with that cost between the parties.

8            MR. LUCEY:  Your Honor, the issue of databases is

9    downstream really from the issue that the defendant is

10   addressing and that I believe the Court needs to deal with.

11       The defendant is going to produce its data on ten DVDs or

12   one hard drive.  There will be a duplicate copy of that hard

13   drive.  Mr. Hahn can have a copy of the hard drive, we'll have

14   a copy of the hard drive.  At that point each party has

15   exactly what Mr. Farrier produced.  Each party is entitled to

16   load that into the fanciest or simplest database they want,

17   code it or whatever else.  There's been an identical

18   production, it is already coded by MI, there's no room for

19   dispute.  Any firm I know takes a snapshot of that hard drive

20   the moment it comes, so everybody always knows what's on that

21   hard drive.  And it actually gets more technical than that.

22       But for simplicity purposes, they're not putting it in a

23   barn, so to speak.  They're going to put it on a hard drive,

24   there will be two identical hard drives.  I'll be happy to

25   personally pay for the second hard drive.  And each group of

1    defendants will have the identical production.

2         THE COURT:  All Mr. Farrier cares is he just has one

3    document dump, whether you dump it on a hard drive or a

4    warehouse.  That solves your problem, right?

5         MR. FARRIER:  It does, Your Honor.

6         THE COURT:  Now, what problem does that create for

7    y'all?

8         MR. HAHN:  If he dumps it one time, we have to saw it

9    in half.  That's all.

10         THE COURT:  No, you don't have to saw it in half, you

11    have to duplicate it.  Electronically that's --

12         MR. HAHN:  As long as we have the exact duplicate, I

13    guess we'll move forward with that.  I envision down the road

14    that might produce some tension, but we'll just have to deal

15    with that, and I'm happy to deal with it.

16         THE COURT:  Produce some tension how?

17         MR. HAHN:  Because technologically it's never that

18    simple, when you're dealing with hundreds of thousands of

19    pieces of paper.

20         THE COURT:  Well, that's something that certainly

21    isn't defendant's fault or the plaintiffs' fault, that's

22    technology's fault.

23         MR. HAHN:  That's technology's fault and that's just

24    something we'll have to understand and deal with as we move

25    forward in the litigation.

1              THE COURT:  So where is Mr. Farrier going to put his

2       documents, in what warehouse, where is that going?

3              MS. OLIVER:  Judge, if I may, Alyson Oliver on behalf

4       of plaintiffs.  We've already worked out CMO-3, which this is

5       contained within.  Everybody agreed to it.

6              THE COURT:  Okay.

7              MS. OLIVER:  Documents are going to be put on a hard

8       drive, they get to choose what sort of hard drive they want to

9       use, they can use DVDs, they can use whatever they want to

10      use.  They give it to us, we copy it, and we have two copies.

11      So it's already been resolved.

12             THE COURT:  So you're okay with that?  You're okay

13      with that procedure?

14             MR. SMITH:  Yes, Judge, Alyson is right.  And then

15      once we give a set of the documents, then they can decide if

16      they want to load them into databases, if they want to load

17      them into two separate databases or what they want to do.  But

18      we'll produce the documents, they'll be Bates numbered,

19      they'll have the same Bates numbers on the documents go to

20      both plaintiffs' parties, and work it out from there.

21             THE COURT:  That's all everybody cares, we're all

22      singing from the same hymnal, right?

23             MR. HAHN:  Right.

24             MR. BRYSON:  Certainly, Your Honor.  And I'll put it

25      on the record; I think to a large extent it behooves the

1    owners' group and the contractors' group to work together on

2    reviewing documents and things of that nature, and we'll make

3    efforts at that in the future.

4        Back to the fundamental issue though, that's raised on

5    page two, Section D, master written discovery, what we propose

6    is that -- and would like, is that each side have a set of

7    discovery they can serve.  We would serve our set of

8    discovery, our master set of production, by next Friday.  Not

9    this Friday, but the next Friday.  And then the contractors

10   could look at it and decide what additional questions they

11   think they need to prove their case on the types of documents

12   they need on behalf of the contractors, and then would serve a

13   request after that.

14       We have negotiated with MI, and we have agreed, we thought

15   we really needed 50, but we've agreed with 35 original

16   requests and 25 supplemental requests.  And that's -- we agree

17   to do that, assuming we can serve our own set of discovery.

18   So the pink language that you see there is our agreement to

19   tone down the number we originally wanted, if we can just

20   serve -- get our discovery served.

21           MR. FARRIER:  Your Honor, our interest is

22   consistency, and one of the things we're trying to do with

23   these CMOs is anticipate and resolve problems that we know are

24   apparent right now.  Our request is that we have a master set

25   of discovery from the plaintiffs, regardless of which faction

1    gets which share of that, and that we respond to that.  And

2    that way we have overall consistency with all the privilege

3    logs, with our responses.

4        You know, I don't know where the two PSCs are in terms of

5    their ability to manage that, but we don't want to have to

6    referee that from our standpoint.  And I also think that at

7    the end of the day there are common interests between the two

8    PSCs that would be served by a common set of discovery.  So

9    the numbers, the number is fine.  And we just ask that it be

10   coordinated and consolidated by the two PSCs.

11        MR. HAHN:  I just want clarification.  I think

12   Mr. Bryson said is the number 35 for him and 25 supplementals

13   for them, so a total of 70 and 50.

14        MR. FARRIER:  That's not what we agreed to.  We

15   agreed to a total of 35/25.

16        MR. BRYSON:  I think that's -- this is the discovery

17   for the ten states we have and the things that we feel like we

18   have to prove, we need 35, which we don't think is burdensome,

19   and we're prepared to propound that by next Friday.

20        THE COURT:  So your take is 35 for the homeowners

21   plaintiffs and 25 supplemental perhaps served a week from

22   Friday.  And then after Mr. Hahn takes a look at it, for him

23   to serve whatever additional requests he wants with regard to

24   the individual issues as to his clients.  Is that --

25        MR. BRYSON:  That's correct.  And he's able to get

1    all the documents they produce, of course, to us, he would get

2    as well.  Then that gives -- that serves MI's purpose of not

3    having Mr. Hahn maybe do the entire duplicate set, that his

4    set would not -- he would not have to do that until after he

5    looks at our set, which we think is reasonable.

6         MR. FARRIER:  Your Honor, I thought we had a pretty

7    clear agreement, contingent on coordination between the two on

8    the numbers.  We started out at 20, we went up to 25 total.

9    I'm sorry, our agreement was for 35 total as between both

10    PSCs.  In a much more complicated case and a much larger

11    entity in Bausch and Lomb, the Court limited it to 50.

12       One of the things the Court is to do in this process, I'd

13    point the Court to 11.451 of the Manual, is to decide --

14    excuse me -- but it is to manage the overall number, which, by

15    the way, would be a starting point.  If that is insufficient,

16    then anyone can come to the Court and ask for additional.  But

17    35 and 25 should be sufficient.

18         THE COURT:  Okay.  Of course, having gone through

19    Bausch and Lomb, it is not more complicated than this, it's

20    much less complicated than this, okay?  One defendant, you

21    know.

22         MR. FARRIER:  I think it's fair to say that one of

23    the major distinctions is there is little comparison between

24    the size and complexity of the defendant in that case versus

25    this.

1          THE COURT:  And so whenever lawyers say agreement, I

2     mean, Mr. Hahn, did you agree with this or did you not agree

3     with this; I don't know.

4          MR. HAHN:  We met this morning, Judge.  I raised this

5     issue over how many do I get?  And there was no clear answer

6     to that, so I can't agree to it until I understand.

7          MR. FARRIER:  Your Honor, the real problem here is

8     the solution that's being proposed, and this is -- I am

9     conflating these two positions -- is in order to avoid a

10    consolidated discovery, both sides want to be able to do

11    whatever they want.  And I don't think that's a very fair and

12    equitable solution as to the defendant.

13        The idea of the MDL, which we resisted, and was being

14    sought by the plaintiffs, is to have a consolidated discovery

15    process.  And the fact that we're going to have enough, we're

16    going to have enough of everything, depositions, requests for

17    production, interrogatories for both sides to do anything they

18    want to independently, I don't think is an effective solution.

19         MR. BRYSON:  Your Honor, as a last comment, I don't

20    want to do whatever we want on this, we're wanting to, again,

21    based on the Court's rulings on motions to dismiss, we're

22    willing to have discovery requests that would encompass what

23    we need to prove, or each of the attorneys need to prove in

24    their various states to establish their causes of action.  And

25    we want to have those requests.  We think 35 is a reasonable

1    number.  I provided those to Mr. Hahn.  To the extent, you

2    know, he may agree, he may have you not ask A, B, C, D, E, F

3    and G, and then he'll add to it.  My guess would be he won't

4    have that many to add, but I don't know, he may.  And then

5    just serve them on MI.

6          THE COURT:  Well, the question, my question is then,

7    the quote unquote "agreement," the quote unquote "agreement"

8    was that you get 35 supplementary requests on behalf of the

9    homeowners, then Mr. Hahn gets some indefinite number of

10   requests on behalf of his clients, and then Mr. Farrier's take

11   on it is 35 total.  So I mean, it doesn't seem to be an

12   agreement to me.

13         MR. BRYSON:  There's not.  That's why I said we

14   agreed to this number based on us being able to serve that

15   number.  And then there was no -- Right, there was no

16   agreement.  That number of 35 and 25 would be for plaintiffs,

17   if we can serve discovery ourselves.

18         MS. LUMPKIN:  Your Honor, if I may?

19         THE COURT:  Yeah.

20         MS. LUMPKIN:  Carol Lumpkin on behalf of MI.  One of

21   the things we're struggling with from the defense side is that

22   when we were in front of the JPML, we suggested coordinated

23   discovery amongst the plaintiffs.  And that was absolutely

24   objected to by the plaintiffs, they thought it would be

25   insufficient, it would not be appropriate, so they insisted on

1     consolidation.

2          Now we're here, we're into our second MDL hearing, and

3     frankly, the defendants find themselves in a very unusual

4     position to be in between the two plaintiff groups with regard

5     to the process.

6          Frankly, we have had many negotiations, and this has been

7     ongoing since our hearing in front of Your Honor on July 12.

8     But Mr. Hahn is correct about one thing.  I mean, he's not

9     participated in many of the attempts to try to move this case

10    forward.  I can't speak as to why, but the reality is, a

11    perfect example is the number of depositions.  We did agree,

12    we tried to work and cooperate and come up with a number.  But

13    if that number is going to be selected only by the homeowner

14    group, then of course the builder group is going to insist

15    that they have their own number.  Meanwhile, the defendants in

16    the middle are going, you know, you can't disrupt an ongoing

17    business this way.  Pick what you want.  And presumably the

18    plaintiffs, and especially Mr. Lucey, who back in May was very

19    adamant about how much information he already has with regard

20    to this defendant, frankly, if they have that much

21    information, and as he, you know, said on the record, he has

22    90 percent of what he needs, he's really just looking for R&D;

23    presumably they could provide one set of discovery amongst

24    both plaintiff groups, that the defendant could start working

25    on.

1          MR. BRYSON:  Your Honor, I think we are as a group.

2     And it's a little embarrassing, we just want to send some

3     document requests and interrogatories to MI.  And I guess Mr.

4     Hahn does, too, on behalf of his clients.  We think it's

5     easier, they're a separate -- the contractor, the homeowner,

6     the manufacturer.  We send a set, they send a set, you know,

7     we could send a set that says homeowners and contractor set of

8     document requests, and he could delineate in that document

9     which ones are his specific interrogatories and which ones are

10    his specific document requests.

11         Everybody gets access to all the information.  We're

12    really, I guess, talking about a numbering issue; how many,

13    more than anything.  You know, quite candidly, we prepared,

14    we're well along on preparing our master set of document

15    requests and interrogatories, and that's why we want that

16    number.

17         With regard to Miss Lumpkin's comments about what

18    Mr. Lucey has, you know, I haven't seen it.  I haven't looked

19    at it.  None of the other plaintiffs have looked at it,

20    because we think there's a confidentiality order out there on

21    that these guys have argued about.  I haven't seen any of

22    those documents.  I hope the day comes when we can see those

23    documents, but that's for another day, I guess, when things

24    are produced.

25         THE COURT:  Okay.  And it may be in here and we

1    haven't gotten to it yet; do you contemplate sending Mr. Hahn

2    discovery, and Mr. Hahn sending you discovery?

3         MR. BRYSON:  That is not contemplated in this

4    document, based on how the evidence developed, but he could.

5         THE COURT:  I'm talking about in the philosophical

6    sense, how about that?

7         MR. BRYSON:  It could happen.  If --

8         MR. LUCEY:  It may, in part, turn on the motion for

9    joinder tomorrow morning, and our position as parties in this

10   case.

11        MR. HAHN:  Judge, I can't imagine that that would

12   happen.  It would destroy all commonality issues that they

13   have for their class.  So --

14        THE COURT:  Okay.

15        MR. HAHN:  -- I see that as a very remote

16   possibility.  But we're happy to do whatever the Court wants

17   to do.  All this would be alleviated if the two plaintiff

18   groups would just work together on a set of interrogatories.

19        THE COURT:  Now, and Mr. Farrier says it would all be

20   alleviated if the two plaintiffs groups would work together to

21   limit themselves to 35 interrogatories.

22        MR. HAHN:  Yes.

23        MR. FARRIER:  Your Honor, the larger -- from our

24   perspective, the larger issue is what's reasonable at this

25   stage of the game.  The discovery is going to have the same

1    utility to both parties, once it comes out of us.  And so the

2    idea of having multiple sets of discovery, there's not a real,

3    I think, defensible rationale for that happening.  So the

4    question really is twofold.  One, what's the number.  I

5    thought we reached an agreement on a number, at least with the

6    homeowners group.  And second of all, whether the plaintiffs'

7    factions are going to work together, as is contemplated, or

8    they're going to go off and do things separately.

9           THE COURT:  But you agree, I think you did, in the

10    prior hearing, that there are different issues with regard to

11    the contractors, since your defense is pointing the finger at

12    them, right?

13           MR. FARRIER:  Absolutely.  But there's -- I think

14    that the two parties could use the same document for different

15    purposes, but the document is the document.  We have produced

16    it.  And it's going to be processed, hopefully, in as few

17    sessions as possible.

18       So I guess, Your Honor, if the question -- and we'll --

19    Mr. Bryson talked about an agreement.  The agreement's really

20    sort of perspective on our working together and finalizing

21    some dates, which we think we can do in the next couple days.

22    So I think that what is going to have to be decided with the

23    Court is what's the number, and whether the process of

24    discovery is going to be bifurcated between the PSCs or it's

25    going to be consolidated.  We much prefer that it be

1    consolidated.  And coordinated.

2         THE COURT:  Mr. Bryson, the quote unquote

3    "agreement," at least the changes in red, contemplates 35

4    original requests and then 25 supplemental requests.

5         MR. BRYSON:  That's correct, Your Honor.

6         THE COURT:  And 25 supplemental requests is -- you

7    don't know whether they're going to use those or not right

8    now, right?

9         MR. BRYSON:  That's if you're in a deposition and a

10   witness makes reference to a document or a file that we hadn't

11   asked for before, that's the thought on that.  You know, it

12   comes up a lot with engineers, there's a file that's

13   inadvertently not been produced, or there's an article that

14   hasn't been produced.  You know, you ask that that be produced

15   to you, but sometimes it's not.  And so -- or sometimes you

16   learn issues or topics that you file supplement requests for,

17   which is, as you know, pretty common.

18        THE COURT:  Okay.  I think we'll start one step at a

19   time.  We'll limit it to 35 original requests from both

20   parties.  If Mr. Hahn thinks that he needs something else, a

21   request, he can apply to me, but I need to know XYZ, whatever

22   they are, okay?

23        MR. HAHN:  Thank you, Judge.

24        THE COURT:  So that's the good way to start, all

25   right?

```
 1            MR. BRYSON:  So we produce our master set and then

 2    have that for plaintiffs, then send it to Mr. Hahn to review

 3    to see what additional --

 4            THE COURT:  Sure.  You're going to file it in the

 5    case, and I guess you're not going to file discovery, but you

 6    send a copy to Mr. Hahn and Mr. Hahn takes a look at it and

 7    say, I need XYZ, and if he wants XYZ, he sends me a letter,

 8    and you can object or agree or whatever; how's that sound?

 9    Just gets it off the snide, as they say.

10            MR. FARRIER:  Just so I'm clear, if a week is the

11    time that we ultimately agree on that we're going to get this

12    master set.

13            THE COURT:  Week from Friday.

14            MR. FARRIER:  Week from Friday.  That's going to be

15    processed by both Mr. Hahn's client and Mr. Bryson's client.

16    That's going to be that master set.

17            THE COURT:  That's the way you think about it?

18            MR. BRYSON:  I would prefer that we have the

19    plaintiffs' set.  We can serve it as a joint document, and

20    then if Mr. Hahn has any requests he wants to add, he would

21    delineate those contractors' interrogatories or document

22    requests, and then we would submit that.  We would serve that

23    then as a single master set.

24            THE COURT:  How's that?  Is that what you want?

25            MR. FARRIER:  If that's what I just said, then I
```

1    think that's right.

2            THE COURT:  Don't reverse yourself.  If you do that,

3    you get in trouble.

4            MR. BRYSON:  We just want to make sure we keep some

5    sort of delineation because of these conflicts and things.

6            THE COURT:  So there's a master set, and then Mr.

7    Hahn can make any requests that he wants with regard to his

8    contractors, as a supplemental request based on what you've

9    asked.

10            MR. BRYSON:  Right.

11            THE COURT:  He'll need to see yours before he makes a

12    decision.

13            MR. BRYSON:  Absolutely.  And it would be so

14    designated in our set that this is the contractors' additional

15    questions.

16            THE COURT:  Okay.

17            MR. FARRIER:  That set that we get, the initial --

18    the 35 is going to contain both what the homeowners and the

19    contractors want from us?  That's what I'm hearing.

20            MR. BRYSON:  That's correct.  You won.  That's what

21    we're doing.  But if then the judge said, if Mr. Hahn thinks

22    that there's additional ones that he needs, he would apply to

23    the Court for that.

24            MR. FARRIER:  That's fine.

25            THE COURT:  Everybody got that?

1          MR. HAHN:  Yes.

2          THE COURT:  Can somebody put that in English in the

3     order?  Okay.  Gotcha.

4          MR. BRYSON:  Your Honor, the next --

5          THE COURT:  All right, we're skipping over the yellow

6     at the top of the page two, and inspections of defendant's

7     manufacturing plants, I don't know whether that's a

8     controversy.  There's no footnote there, so I don't know what

9     that means.

10          MR. BRYSON:  Your Honor, it ties into Section E under

11    document production.  What's contemplated, and this was a

12    contractor addition, that following entry of this order, that

13    there be a meeting to talk about production of documents,

14    things of that nature.  We don't think that's necessary, and

15    we'd like to proceed with immediately serving the discovery

16    requests.  We have the ESI order, et cetera.  However, we're

17    negotiating with MI and the contractors' group on this

18    particular provision.  And we'd ask that you hold this portion

19    of the order open until tomorrow morning on the status

20    conference, because we think we may have an agreement on a

21    custodial production of documents and things like that, that

22    tie into the ESI, that we're still talking about.  And if Your

23    Honor is okay with that --

24          THE COURT:  Fine with me.

25          MR. BRYSON:  -- we can hold a status conference on

1    this tomorrow morning.

2             THE COURT:  That's paragraph E?

3             MR. BRYSON:  That's correct.

4             MR. FARRIER:  That's fine, Your Honor.

5             THE COURT:  Great.

6             MR. BRYSON:  The next thing, Your Honor, is Section

7    G, duration of the examinations.  And I think that we -- with

8    the purple language, we may have had a breakthrough there.

9    Our concern was that at seven hours there be a technical or an

10   engineer or an expert that has a lot of information, we get to

11   Pennsylvania or wherever, and you know, it's 5:00 o'clock and

12   it's like, We're done.  And I think we have got some language

13   that I think alleviates our concerns, MI can live with, so I

14   think that G is pretty much agreed to.

15            MR. FARRIER:  Your Honor, I think that G -- my read

16   of it is it's consistent with the Federal Rules, that there's

17   a presumptive limitation.  If they need to go over for an

18   hour, they're going to ask us, and we'll say yea or nay.  If

19   there's a problem, somebody -- you're going to get a call.

20            THE COURT:  That's fine.

21            MR. HAHN:  We can live with that, Judge.

22            THE COURT:  Sounds good.

23            MR. BRYSON:  We've agreed, we've agreed to a number

24   of depositions.  The 25, speeding right along, I think now you

25   go --

1          MR. FARRIER:  I think that's it.

2          MR. BRYSON:  I think there was an issue -- there was

3     some language we added in under Section C, and this bears some

4     mentioning.  It's just coordination.  If there are separate

5     State Court actions, we changed the language on that, you can

6     see the red, bring it to the Court's attention.  The parties

7     will negotiate coordination of discovery with State Court

8     actions when and if the situation arises, and submit a

9     separate CMO on this issue.  I think there is already a

10    separate state action that's been filed.  We probably need to,

11    at the status conference, report on that actually, as to what

12    that action is, make sure the Court's aware.

13         THE COURT:  Have we got some State Court actions?

14         MR. FARRIER:  A Jeff Leaf has filed a lawsuit, I

15    think in York County.

16         THE COURT:  I can squash him, and will.  All right.

17    So if you can -- and I think this worked pretty successfully,

18    Mr. Hahn, that if you can identify State Court actions and

19    State Court judges -- of course, I don't know whether this

20    is -- in South Carolina the judges rotate, so -- but I'd be

21    glad to reach out and call the State Court judges.  And we had

22    coordinated with State Court and Federal Court hearings, and

23    try to get it so -- for everybody's purposes, we're all in the

24    same boat.  And so if you just identify them and let me know

25    who they are, you know, sometimes they're -- State Court

1    judges are great, sometimes they blow me off, but I don't

2    care.

3            MR. FARRIER:  Your Honor, we'll provide that in an

4    e-mail, the contact information, it's a large number, et

5    cetera.

6            MR. BRYSON:  And what was addressed in this discovery

7    order is, you know, just making sure there was a process that

8    protects us, that attorney may reach out to us, wanting

9    documents we've got, they may send the document requests,

10   discovery requests to MI, and that's something that will

11   probably need to be dealt with sooner than later, if that

12   attorney -- if their action is not stayed or perhaps put on

13   the back burner.  But I'm sure they'll probably be wanting to

14   proceed with discovery.

15           THE COURT:  Okay.  Yeah.

16           MR. HAHN:  Can we go back to E?

17           THE COURT:  Sure.

18           MR. HAHN:  I didn't understand we had an agreement.

19   Y'all had this sort of -- what are --

20           MR. FARRIER:  I don't think we have.  My

21   understanding from discussions with you and with the other

22   PSC, is that we have conceptual agreement, more fully

23   articulated, frankly, with the contractor plaintiffs about the

24   sequence and timing of discovery.  Mr. Bryson has talked about

25   that.

1          THE COURT:  I think y'all said you're going to

2    continue to talk about it, and we'll address it in the

3    morning.

4          MR. BRYSON:  It's Mr. Hahn's proposal on this, but

5    we're wanting to know more about it before we would agree to

6    it.

7          THE COURT:  So --

8          MR. HAHN:  We're all meeting after this?

9          MR. FARRIER:  Correct.

10          MR. HAHN:  That's what I need to know, Judge.

11          THE COURT:  So we're not going to address this till

12   tomorrow?

13          MR. HAHN:  Apparently.

14          THE COURT:  Okay.

15          MR. BRYSON:  Judge, that's it on the CMOs.

16          THE COURT:  Okay.

17          MR. BRYSON:  And we'll get a revised version

18   submitted to you based on where we end up with --

19          THE COURT:  Bring it to me in the morning, make sure

20   everybody has read it, and we'll go with it and go from there,

21   okay?  Okay.

22          MR. LUCEY:  Your Honor, the last one is CMO-4, and

23   we've submitted some papers to you.  Mr. Gupta with our PSC

24   would like to address Your Honor with regard to that proposed

25   CMO.  He's with Mr. Richard Arsenault's office.

1          MR. GUPTA:  Good afternoon, Your Honor, Srivatsa

2     Gupta for the plaintiffs.

3          You know, I was really moved by Mr. Farrier's earlier

4     words that one of the things we're trying to do here is

5     anticipate and resolve issues that may arise in the

6     litigation.  And that's exactly what this CMO that we've

7     proposed is designed to do.

8          I understand that defendants have a philosophical

9     objection and, you know, they believe that this kind of order

10    is unnecessary and superfluous.  I would maintain that it's

11    not.

12         You know, and I apologize to the --

13         THE COURT:  Unless he's not going to assert any

14    privileges, then it probably is.

15         MR. GUPTA:  Maybe then I believe the other word he

16    used was premature, and that may more accurately characterize

17    the defendant's feelings.

18         You know, I apologize to the Court for submitting the

19    lengthy supplement background material, and I hope that the

20    Court had the time to review it.

21         THE COURT:  I read Professor Rice's report with great

22    interest.

23         MR. GUPTA:  Well, then, Your Honor, you saw the issue

24    that arose in Vioxx where the plaintiffs and the defendants

25    had differing views on whether documents were privileged.  And

His Honor, Eldon Fallon, from the Eastern District of
Louisiana, reviewed, had something like 80 boxes of documents
for in camera review, and decided that of the 8000, only about
500 were actually privileged.  And that the defendants were
not happy with this ruling, and filed a Writ of Mandamus to
the Fifth Circuit, who suggested but did not order that a
representative selection of the documents needed to be
re-reviewed.

You know, in that case a special master was hired to
handle that situation, at great cost, on the order of half a
million dollars.  And so since that experience, you know,
plaintiffs have been trying to put in an order in advance, to
avoid that kind of scenario in the future.  The proposed order
we provided the Court is the result of negotiations and other
MDLs with sophisticated defendants and sophisticated defense
counsel.  It's not a plaintiffs' wish list.  We're not trying
to put one over on the defendants; we think it's an accurate
statement of the law of privilege and what is necessary to
assert it.

You know, it's our position that by dealing with this now,
the defendants will be able to know specifically which
elements they need to put into a privilege log in order not to
inadvertently waive privilege.

I know Mr. Smith represented in the ESI negotiations that
defendants do not plan on waiving any privileges.  And, you

1    know, as is well settled in the Fourth Circuit, the penalty

2    for an insufficient privilege log is a waiver of that

3    privilege.

4        So all we're trying to do is put into writing exactly

5    what's necessary to avoid an impasse in the future.

6        Thank you.

7            MR. FARRIER:  I have a little packet that will be

8    assembled for you in a moment, Your Honor.

9        You know, our problem with -- we've got some specific

10   problems with case management order number four as proposed.

11   But I want to talk about the overall problem.  And our overall

12   problem really is not one of convenience and not one of really

13   anticipation, but is a constitutional problem.

14       There's a distinction between choice of law between state

15   law, which would govern the issue of privilege, and federal

16   law.  And, in fact, if you look at the history of Judge Fallon

17   and some of the orders that were passed up, you can see

18   exactly how that played out.  Because Judge Fallon originally,

19   after an extensive discovery dispute in Vioxx, issued a very

20   lengthy order, just like the one that's been submitted to the

21   Court.

22       And what he tried to do was anticipate problems, and

23   short-circuit those problems by saying that we're going to

24   adopt a federal body of common law that we're going to apply

25   to these privilege issues as they come up in the case.  That

1    caused him to personally review these 20,000 or so documents,

2    and to make judgments under those documents.

3        Based on that original ruling in his CMO, similar to

4    CMO-4, if you look at the first page of the proposed CMO-4,

5    under Roman two, you'll see a statement, "The parties have

6    agreed that federal common law governing privilege applies,

7    including the general and specific principles set forth in In

8    Re:  Vioxx Products Liability."

9        (Brief interruption in proceedings.)

10            MR. FARRIER:  Your Honor, first thing I'd like to

11   direct you to is U.S. In Re:  Vioxx, March 6, 2007, which is

12   2007 Westlaw 854251.  And even Judge Fallon at the time

13   recognizes this overall principle that I just noted to you on

14   page two under Roman three A, although state law applies to

15   Merck's attorney-client privilege, the Work Product Doctrine,

16   as a matter of federal law -- this order, by the way, merges

17   those two doctrines -- the Work Product Doctrine is distinct

18   from, broader than the attorney-client privilege.

19       He goes on to create the same compromise standard that's

20   being proposed to you in this proposed CMO-4.  And that is set

21   forth in 501 F.Supp. 789.  That's the In Re:  Vioxx opinion.

22   On page five under Roman two, accordingly, the Court will now

23   reproduce the substantive portion of special master's report,

24   and goes on to set forth this federal standard in the

25   carryover page; the same one that's being proposed here.

1        The next opinion is the Fifth Circuit's review of this

2   process.

3              THE COURT:  Is that what you supposedly gave me?

4              MR. FARRIER:  I thought it was.

5              THE COURT:  What I've got is Chinese Manufactured

6   Drywall, Yaz and Caremark Health.

7              MR. FARRIER:  Your Honor, I'll provide copies of

8   this.  I don't want to hold things up, but I'll get them to

9   everyone today.

10             THE COURT:  That's fine, my clerks have already

11  memorized those, so that's all right.

12             MR. FARRIER:  And the Court addresses Judge Fallon's

13  approach, the Fifth Circuit.  And without quoting it, it says

14  that while this is expedient, it violates constitutional

15  principles.  That ultimately the Court is going to have to

16  deal with state privilege issues by each state's law.  And

17  that the idea of supplanting the law with a compromised

18  federal standard is inappropriate.  The one case that I did

19  send you, the In Re:  Yasmin and Yaz, discusses this same

20  issue.

21        So, Your Honor, as these privilege issues are going to

22  arise, assuming they do, we're going to have to look at the

23  brief and discuss those according to the state in which they

24  arise.  That state's law is going to determine choice of law,

25  and it's going to determine the privilege issue.  And there's

1    no way to shortcut that, as this order attempts to do.

2        There are a couple of other things that I would, just in

3    flipping through this, I'd like to point out.  In the proposed

4    order under A, general principles, you have a set of

5    standards, the attorney-client privilege applies if -- and

6    this is the Vioxx standard, this is the compromise standard

7    adopted in Vioxx, and the one that was ultimately rejected.

8        There are other issues in here that are specific to this

9    case, that we raised when we discussed CMO-4.  There's a

10   portion of this that deals with redaction of confidential,

11   irrelevant and privileged information.  We already have a

12   local rule that addresses that, which is the ECF Rule 13.4.3.

13   This is either redundant, or in some cases inconsistent with

14   the local rule on this issue.  So there's no need for this.

15       And finally, under privilege dispute procedure, we're not

16   amenable to agreeing that if we don't specifically follow this

17   privilege dispute procedure, we will be deemed to have waived

18   the attorney-client privilege.

19       What we would propose, Your Honor, if the Court -- first

20   of all, we don't think an order is necessary.  We think we're

21   going to have to address attorney-client privileges as we move

22   along.  We don't know what that's going to look like.  We

23   don't think we can anticipate and circumscribe how we're going

24   to claim a privilege in a specific state.  But as those issues

25   arise, the Court will have to deal with them.  There's a body

1    of federal and state law which governs that, and it shouldn't

2    be modified for the sake of having a compromised standard.

3        What we had drafted but had not submitted to the Court was

4    a very short order.  What I handed up was Judge Fallon's more

5    recent order, which is a four-page order, which sets forth

6    some general standards.  And if the Court believes an order is

7    necessary to cover the scope, as anticipated in the CMO-4, we

8    don't think it's necessary, but if the Court believes one is,

9    then we're prepared to submit an order in line with Judge

10   Fallon's more recent order.

11          THE COURT:  Okay.  Assuming for the purposes of this

12   that -- We're going to get to privilege, everybody knows that.

13   It would probably help everybody in the litigation at least to

14   agree on what has been identified in the privilege log.

15   Because I think in every state, no matter if there's a

16   privilege asserted, you have to submit a privilege log, and

17   the information on the privilege log is the starting point for

18   any analysis.  And in my experience, the paucity of

19   information or the incorrect information on a privilege log

20   makes everybody's job a lot harder.  I don't really care about

21   making your job a lot harder, but I care about making my job a

22   lot harder a lot.

23       Yes, ma'am.

24          MS. LUMPKIN:  Well, I have a request for

25   clarification on that, Your Honor.  Are you addressing with

1    Mr. Farrier whether we should have some type of protocol on

2    the privilege logs that will be produced in this case, by

3    state?  Will it be by state, how are you looking to state law

4    on the privilege issue, or do you want a protocol that's just

5    going to be more general, understanding that within that, we'd

6    look to the state law with regard to the privilege issue?

7              THE COURT:  Yes, sir?

8              MR. LUCEY:  Plaintiffs would submit that's getting

9    more complicated than necessary.  And if I may approach the

10   bench and hand up to the bench, there actually has been one

11   privilege log produced in this case by MI.  I believe the

12   Court will agree that it was very inadequate and doesn't

13   address any of the issues necessary for plaintiffs to

14   adequately determine the privilege they asserted, and whether

15   or not it can be challenged.  So the point of that is we're

16   here now, we already have the privilege problem.

17      If I might suggest to the Court to shortcut this, it seems

18   as though the principles set forth in Vioxx are well put and

19   well said and generally applicable.  And to the extent that

20   they quoted the constitutional issue correctly, and I don't

21   have a copy of the case in front of me, I might suggest that

22   we could go with the attorney-client privilege and Work

23   Product Doctrine order, with a safe harbor caveat.  And the

24   safe harbor caveat would reserve to any party that finds a

25   material difference in state law that's applicable to their

1    claim of privilege, reserves to that party the right to bring

2    it to the Court's attention.  So we're not actually

3    establishing a federal common law as to privilege, we're

4    establishing a set of case management principles, which any

5    party can ask for variance of, if they can show a material

6    variance in state law.

7            MS. LUMPKIN:  Your Honor, if I may follow up on that?

8            THE COURT:  Sure.

9            MS. LUMPKIN:  As to the Johnson privilege log that

10   pertains to Johnson, it's before this MDL even, you know -- as

11   a matter of fact, I don't even know it's on there, because

12   we're not counsel, we weren't counsel in Johnson.  But we

13   certainly understand the need going forward for some type of

14   protocol, and we certainly would be happy to work through

15   that.

16       When this was first proposed to us, we want to thank

17   plaintiffs' counsel, because they were very helpful in

18   providing some samples, which is what was attached to the

19   CMO-4 that was filed yesterday.  The reason we objected is

20   primarily not only because, as Mr. Farrier has pointed out,

21   there's just misstatements of the law within the proposed CMO,

22   but also because it is premature.  None of the cases that are

23   attached to the CMO-4 proposed by the plaintiffs had this type

24   of order entered in the inception.  As a matter of fact, in

25   Vioxx, 2.3 million documents had already been produced, and

1    there was a 30,000 document privilege log that the judge had

2    gone through and that had been presented to the Court, there

3    are numerous motions to compel.  The same with the Avandia

4    case.  In the Avandia case there was a seventh R and R from a

5    Magistrate Judge before the Court went through this analysis.

6    Because, frankly, it is a painful analysis when you're dealing

7    with State Court actions that are part of an MDL.

8        When the Fifth Circuit went back on the Vioxx case and

9    sent it back to Judge Fallon, one of the things the Circuit

10   pointed out is MDLs, while consolidation is intended to be

11   beneficial and create some kind of efficiency, it's not a

12   process that doesn't have tremendous strains with it.  And

13   this privilege analysis is one of them.

14       So one of the things that we point out is that it is

15   somewhat premature now.  And the reason we provided the Court

16   with Judge Fallon's latest and most recent opinion in Drywall,

17   is because I think Judge Fallon himself, after going through

18   the analysis in In Re:  Vioxx back in 2007, and after going

19   back up to the Fifth and coming back down, I think Judge

20   Fallon realized that a four-page order might be more in order

21   with regard to this type of issue in a case such as an MDL

22   like this.

23       Avandia, Pinnacle, Actos, all of those cases that are

24   attached as samples, were MDLs where these types of orders

25   were entered, but after numerous discovery disputes, after

1    millions of documents, all within the context of pharma cases

2    or medical devices where you had, you know, wrongful death,

3    you had all kinds of issues, highly regulated type of

4    industry, where the privilege or work product was certainly

5    going to be scrutinized by a Court.  We've got leaky windows,

6    if at all.

7        So it is somewhat premature.  And while we recognize that

8    there may be a need going forward, we really believe that

9    something as, frankly, the CMO proposed would have to be

10   revised substantially, but we would think something more akin

11   to what Judge Fallon has now entered in Drywall would be

12   appropriate in this case.

13            THE COURT:  Yes, sir.

14            MR. GUPTA:  Your Honor, I'd just like to state two

15   quick corrections.  In the Actos case, the order was entered

16   before the commencement of discovery, for the commencement of

17   written discovery.  And in the Pinnacle it was entered before

18   written discovery, but much of that discovery had already been

19   produced in a similar case, and it was just cross noticed.

20       You know, what I'm hearing from the defendants is a little

21   different than what they gave us in their letter yesterday or

22   to the Court, which was a philosophical objection.  Here,

23   they've got specific examples of what's wrong with the order.

24   And, you know, we provided a copy of this to the defendants

25   about a month ago.  And we had a meet and confer where we

1    asked them specifically for problems they had, examples of

2    misstatements of the law or corrections that may apply, and we

3    got zero response.

4        We're happy to negotiate this order.  You know, if there

5    are misstatements of the law, it's my understanding that MI

6    Windows is a California corporation with a principal place of

7    business in Pennsylvania.  I'm sure they have operations in

8    other states; I'm sure they don't have operations in every

9    state.  You know, both the plaintiffs and defendants just

10   briefed and argued ten different state laws this week.  You

11   know, I'm sure we can find the applicable privileges and set

12   out what the law is, if the defendants are willing.

13            THE COURT:  Yes, ma'am?

14            MS. LUMPKIN:  In the Yasmin case that Mr. Farrier

15   handed up, the Court took it upon itself to go through the

16   Vioxx case and explain why the Vioxx approach was not the

17   appropriate approach, given what the laws require and 501, FRA

18   501 requires.

19       There is -- it's pretty established law that if the claims

20   arising in an MDL come from state claims, state law applies to

21   the privilege.  And there's a big difference between --

22   obviously Your Honor is aware of -- between the immunity, the

23   doctrine, and the privilege issue.  The doctrine, the Work

24   Product Doctrine, certainly can be addressed through federal

25   law.  But the privilege issue has to be analyzed under a

1    choice of law, and then privilege law within the state, which

2    is why this seems a bit premature at this inception of the

3    case.

4        And I stand corrected, because I wasn't part of that

5    litigation, so I'm sorry about that.  I think there was like

6    case management number six, a little further along than ours.

7        But having said that, one of the things that the judge

8    analyzed in the Yasmin case is that he looked at and

9    determined that there are three types of cases in an MDL.  You

10   have the cases filed directly to the MDL, you have the cases

11   that have been transferred from another jurisdiction, which is

12   what we have here, and you have the cases that originated

13   outside the jurisdiction, and then become part of an MDL or

14   filed with the MDL.  And the judge went through very very

15   specifically and, you know, methodically and analyzed why and

16   when you have to apply state law and when you look to the

17   federal law.  If you have federal defenses or federal claims

18   within the MDL, then you have to look to federal law.  But in

19   a case like this, which is based on diversity, the state

20   claims would dictate.  And depending on the jurisdiction that

21   you're in and we're looking to, there's a different standard

22   as to what choice of law.  And I recognize it's burdensome and

23   I recognize it's a painful process, but frankly, that's what

24   the law requires.  And the MDL does not excuse that.

25              THE COURT:  All right.  So I'll take a look at -- I

1    would encourage you to get together and try to negotiate at

2    least some kind of procedure, especially with regard to

3    identification of documents and privilege logs.  I mean,

4    that's the starting point in any analysis of privilege, is if

5    you assert privilege, then you put a privilege log, and a

6    privilege log ought to have enough information for someone to

7    be able to look at it and have a good idea what's in the

8    document itself.

9              MS. LUMPKIN:  Yes, Your Honor.

10             MR. FARRIER:  Your Honor, that's -- I guess what --

11   We're fine with that.  We think that the law requires us to,

12   if we're going to claim privilege, to create a privilege log,

13   to put information on there sufficient for the other side to

14   understand what the document is, what the nature of the

15   privilege is, why it's being asserted as to this document.

16   For instance, why the distribution of the document that might

17   cancel that.

18        I do think that there's a problem with, at this point, and

19   we don't know what documents are, what sort of language is out

20   there.  But to the extent that the Court would be helped by

21   having an order in place with some of that structure, we'll be

22   glad to work with the other side towards that end.

23             THE COURT:  All right.  Yes, sir?

24             MR. GUPTA:  I would just note that the Fourth Circuit

25   Interbake Foods case that's cited in the order does require a

party who is using a privilege log to assert privilege, the

log must, quote, "...as to each document, set forth specific

facts that, if credited, would suffice to establish each

element of the privilege or immunity that is claimed."

        MR. FARRIER:  We'll do that.

        THE COURT:  All right, thanks.

        MR. GUPTA:  Thank you, Your Honor.

        THE COURT:  What else have we got this afternoon?

Yes, sir, Mr. Hahn?

        MR. HAHN:  Your Honor, this kind of goes back to what

we were talking about earlier, the letter that Mr. Lucey

handed up to the Court, this is the first time contractors

have heard that a subpoena existed, much less that 2500

documents were produced on June 25th.  We know nothing about

any of this.  And which highlights the issue that we're

talking about, that we need a standard, Judge, so that we can

see the documents as they're produced.

        THE COURT:  All right.  So --

        MR. BRYSON:  Your Honor, I think on the agenda I was

looking --

        THE COURT:  So I guess maybe the answer to the

question is why didn't other parties get a copy of the

documents that were produced by the defendant in this case?

        MR. LUCEY:  Your Honor, I'll be happy to research

that.  My memory is a subpoena was issued long before any of

1    these cases got MDL, and that this privilege log actually came

2    after the documents.  But this was only in -- the subpoena was

3    issued in Johnson, not in the MDL.  And I am sure it predated

4    it by many months.  Johnson, of course, has been pending for

5    several years.

6              THE COURT:  Sure.

7              MR. HAHN:  Judge, it's part of the MDL, Judge, and

8    this clearly says, talks about the documents.

9              MR. BRYSON:  I haven't seen them either, Your Honor,

10   nor any of the attorneys in the other state, just pending

11   these proceedings, so Mr. Hahn hasn't missed anything.  I

12   mean, those documents haven't been produced among the various

13   plaintiffs.  Can they?

14             MR. LUCEY:  We're under a Johnson confidentiality

15   agreement which I think is being broadened or has been

16   broadened, but many times on the record MI has limited our

17   ability to share with any other counsel until those matters

18   are finalized.

19             MR. BRYSON:  Can we see them now?

20             MR. HAHN:  Mr. Ouzts is in the courtroom; maybe he

21   can tell us.

22             MR. OUZTS:  I don't have a perfect recollection of

23   what happened, but these documents were not produced by MI

24   directly, they were produced by a third party, independent

25   third-party vendor, in response to a subpoena that was issued

1    in the Johnson case, directly to Fenestration Services, Inc.

2    Fenestration Services hired an attorney to assist them in

3    responding to the subpoena.  The attorney requested and was

4    granted at least one extension of time to respond to the

5    subpoena, and maybe even more time; I'm not real clear on

6    that.

7        And because there was a confidentiality provision in the

8    contract between Fenestration Services and MI Windows, it was

9    agreed between counsel for Nadine Johnson and counsel for MI

10   Windows, that counsel for MI Windows would review the

11   documents that had been selected by Fenestration Services for

12   production, for the purpose of marking any documents that were

13   privileged or confidential, which is how we ended up with the

14   documents and reviewing them before they were produced to

15   Mr. Lucey's firm.  Now, where the MDL action stood at that

16   point in time, I am not clear.  I don't remember the dates.

17   But those were the essential circumstances of the production.

18        THE COURT:  So if I understand correctly, MI Windows

19   does not have any objection for Mr. Lucey to turn over FEN-1

20   through 2466 to the other members of the homeowners or the

21   contractors, is that right?

22        MR. OUZTS:  No, Your Honor.

23        MS. LUMPKIN:  No, Your Honor.

24        MR. OUZTS:  And that was another issue in the case,

25   the confidentiality order had not been entered as of that

1    time.  They were produced with an understanding that

2    plaintiffs' counsel would treat them as confidential under the

3    proposed order.  But we have no objection to those documents

4    being supplied.

5            THE COURT:  Now, Mr. Lucey, you can feel free to

6    share them with whoever you want to share them with.

7            MR. LUCEY:  Thank you, sir.

8            THE COURT:  Now, Mr. Hahn, you're now even with

9    Mr. Bryson, you both will be able to read something on the way

10   home.

11           MR. HAHN:  Thank you, Judge.

12           THE COURT:  You're welcome.

13           MR. BRYSON:  Your Honor, as I look at the -- we have

14   kind of two agendas, our agenda and MI's agenda.  And some of

15   the things that are on their agenda, home inspections, you

16   know, on our agenda, protocol of inspection of homes; other

17   one, inspection of factories, you know, things of that nature,

18   I think that's where we're going to try to address in this

19   continuing discussion that we're having that we'll resume with

20   the Court tomorrow morning on perhaps rolling custodial

21   document production, things of that nature.  So I would ask

22   that that be put off.

23       Looking at MI's agenda, I'm down then, I think, to number

24   nine, which says joinder of Lakes of Summerville and Johnson,

25   that's for tomorrow, correct?

1          THE COURT:  Yes, that's tomorrow morning.

2          MR. HAHN:  Yes, Your Honor, 2:00 o'clock?

3          THE COURT:  Yeah.

4          MR. BRYSON:  Then looking at our agenda, I think this

5     protocol for inspection, you know, we need to raise with MI as

6     well, and I'm not sure this is on the agenda as part of it,

7     preservation of evidence by the defendants with regard to

8     windows, exemplars of windows, windows of these particular

9     series that are at issue, making sure they don't destroy any

10    of those, if they're in warehouses or manufacturing

11    facilities, things like that, we want to address that with

12    them.  But it's kind of like a litigation hold kind of deal.

13    But I don't envision problems with that, but just to bring

14    that to the Court's attention, we're turning our attention to

15    that.

16      We don't have anything else other than some thoughts we

17    have about the next status conference.

18          MR. LUCEY:  With the caveat that the scheduling item

19    that we're dealing with, we have agreed to try to resolve by

20    tomorrow the initial scheduling item.  And the only one we

21    care about for now is the lifting of the stay on discovery,

22    which I think was timely.  And either we're going to go to the

23    rules and submit discovery, or we're going to have agreed to a

24    rolling production with the defendants that we'll put on the

25    record tomorrow.  But that one last scheduling thing.

1          THE COURT:  So we'll take care of that tomorrow.

2    We'll either decide it or agree on it by tomorrow, right?

3          MR. BRYSON:  That's correct.

4          MR. HAHN:  Judge, when do you want us here tomorrow

5    for that issue?

6          THE COURT:  I don't know what the schedule is

7    tomorrow.  The first argument is 9:30, isn't that right?

8          MR. HAHN:  We're showing 9:00 o'clock, Your Honor,

9    for DeBlaker motion to reconsider; 10:30 Hildebrand; and then

10   2:00 o'clock was the contractor.

11         THE COURT:  You want to come tomorrow morning and

12   we'll just knock yours out when everything is over with,

13   rather than come tomorrow afternoon?  You'll be here anyway.

14         MR. BRYSON:  I envision tomorrow will go pretty

15   swiftly as well.

16         THE COURT:  Why don't you come tomorrow morning.  You

17   want to be here anyway, so we'll argue it when we get

18   everything else done.

19         MR. BRYSON:  We're starting at 9:30 or 9:00?

20         THE COURT:  9:00 o'clock.

21         MR. BRYSON:  Your Honor, the last thing, with regard

22   to the next status conference, if we understood Your Honor

23   correctly, the only time you had in November would have been

24   that last week in November?

25         THE COURT:  I mean, I've got Thanksgiving week, but

1    nobody wants to do it Thanksgiving week.  If you want to do it

2    Thanksgiving week, I'm close to home, we'll have it here, but

3    you can explain to your families.  So I was thinking maybe --

4    I've checked on the trial for the first two weeks in November,

5    it's still going forward, it's a huge terrible case that

6    Mr. Farrier's ex-partner, if he gets squashed, he's really

7    going to get squashed in this one.  But so when I said the

8    27th, that's a Tuesday, so everybody doesn't have to travel

9    Sunday, so that's fine, and we can do it anywhere you want to

10   do it.

11            MR. BRYSON:  Here's our proposal, Your Honor.  We

12   propose the status conference be on November 29th in New

13   Orleans.  And the reason for that would be, on the 30th there

14   is a seminar, the Louisiana State Bar Association has a

15   seminar on complex litigation.  I understand it would be the

16   twelfth annual complex litigation seminar.  Speaking at that

17   seminar are a number of MDL judges, Judge Fallon and some

18   others.  Mr. Gupta can address it, his firm is very involved

19   with it; a number of defense firms are involved as well.

20       And I believe that -- not I believe -- I know that

21   Mr. Gupta's firm, he's involved with that seminar, would like

22   to extend an invitation to Your Honor to speak on the 30th at

23   this seminar on a panel with Judge Fallon and a couple other

24   MDL judges.  And also invite K&L Gates; there are some other

25   slots open, and I'd invite K&L Gates to speak at the seminar.

1    So that there would be the status conference on the 29th,

2    the Louisiana seminar involving complex litigation would be on

3    the 30th, and then that way for everyone involved they could

4    maybe do a little CLE, see New Orleans a little bit, those

5    that wanted to go a little bit superfluous.  But our proposal

6    would be for the status conference to be on the 29th.

7    I'd ask Mr. Gupta to provide a bit more information about

8    it.  We have forwarded an e-mail to K&L Gates giving them

9    information about the seminar, so they can see it's not a

10   seminar that's -- you know, it's a balanced seminar.  And

11   certainly the plaintiffs, we would agree, if they speak at it

12   or I'm scheduled to speak at it, no one is going to be

13   subpoenaing the other and using it as evidence in this trial,

14   it's just a seminar.  But I think what's particularly

15   interesting are a number of the other MDL judges who would be

16   speaking at this.

17        THE COURT:  Okay.

18        MR. FARRIER:  Your Honor, that's an issue that sounds

19   like a lot of fun.  I love New Orleans.  I just got back from

20   a wedding with a couple of my daughters.  It does present an

21   expense to the client that, I mean, I really don't feel

22   comfortable consenting to taking a small army to New Orleans.

23   And frankly, I hate to deprive the Court of an opportunity to

24   speak at the seminar, or maybe one of us, but it is -- I think

25   it would be a fairly significant expense.  It's something we'd

1    have to look into.

2              THE COURT:  Of course, the expense, there's also

3    these folks over here who have had to undergo the expense to

4    come to Charleston several times, and I think it's only fair

5    to go to wherever some of these folks are.  I mean, I think

6    New Orleans is probably nicer in late November than Chicago

7    is, not denigrating anything.  You can deal without a small

8    army, just have a tiny army.

9         I guess it would depend upon what's being discussed and

10   how substantive everything is going to be and all that.  I

11   mean, you know that in the long run, but I don't have any

12   problem, I don't know about speaking, because I'm supposed

13   to -- again, I'm supposed to be in Chicago -- the 29th -- 27th

14   is a Tuesday, 29th is a Thursday, I guess?

15             MR. GUPTA:  That's correct.

16             THE COURT:  I have to go to Chicago on Friday because

17   my wife's working in Chicago that weekend and it's her

18   birthday that weekend, so I may not be able to stay for the

19   seminar, but I'd like to stay for the seminar personally.  But

20   I'll cross that bridge when we come to it.

21        So right now tentatively why don't we set it for the

22   29th in New Orleans.  And we can discuss whatever matters are

23   pending at that time.  All right?

24             MR. GUPTA:  Your Honor, my firm would be happy to

25   coordinate any matters that need to take place for us to have

1    that status conference there.

2              THE COURT:  And if you can send us some information

3    with regard to that seminar, if I --

4              MR. GUPTA:  We'd be happy to, sir.

5              MR. BRYSON:  Your Honor, should Mr. Gupta perhaps

6    coordinate with someone on the Federal Court staff to make

7    sure the courtroom availability, things of that nature?

8              THE COURT:  I'll talk to Judge Fallon or I'll get a

9    courtroom available.  We'll call down there.

10             MR. BRYSON:  Let us know.

11             MR. GUPTA:  Thank you, Your Honor.

12             MR. HAHN:  One other quick matter, Your Honor, since

13   we're all here.  There was an issue with confidentiality of

14   some additional documents that Mr. Lucey has.  And since

15   everybody is here, will MI waive that confidentiality so he

16   can produce those to the PSC as well?

17             THE COURT:  You mean the ones he subpoenaed himself?

18             MR. HAHN:  Yes, sir.

19             MS. LUMPKIN:  Your Honor, we can't agree to that.

20   One, because there was a reason there was a confidentiality in

21   place.  Two, and a return, part of it was a return of the

22   documents.  Two, we were not counsel of record on that case;

23   we need to know what was provided to Mr. Lucey and have the

24   client go through that.  We don't know what Mr. Lucey has in

25   his possession, because we weren't counsel of record, we don't

1    know.

2          MR. LUCEY:  Mr. Ouzts' firm was counsel of record, so

3    they were all Bates stamped and recorded, so they do, in fact,

4    know what I have, first.  Second, I believe if we clarify some

5    wording, I don't think Mr. Hahn's requesting a release of

6    confidentiality as to the documents generally, he's requesting

7    we confirm that he's allowed to see them under the existing

8    confidentiality agreement.  As I understand it, they've

9    already consented for those documents to be under that

10   confidentiality agreement.  I'm bound by it.  And since we

11   have a global confidentiality agreement, I can now share those

12   with Mr. Hahn.  And just lastly, make sure the record's

13   absolutely clear, some of those documents -- in fact, maybe

14   perhaps most of them, are not stamped confidential and are not

15   confidential.  They were either stamped at the time or not.

16   We have simply kept them as one group of documents.

17         MS. LUMPKIN:  Well, Your Honor, that goes to the

18   heart of the issue.  We weren't counsel of record, we don't

19   know if things were properly marked confidential.  I think the

20   client has a right to determine whether --

21         THE COURT:  I don't think you get two bites at that

22   apple.

23         MS. LUMPKIN:  But, Your Honor, it's not the same

24   case, and there's a case where there's an agreement between

25   counsel that are not present, because Mr. Ouzts was not

1    involved in that case.

2          THE COURT:  Well, he just said that Mr. Ouzts' firm

3    was involved in the case.

4          MS. LUMPKIN:  The firm was, but Mr. Ouzts had nothing

5    to do with that case.  So my concern is we're -- One of the

6    things that was agreed to in May on record by Mr. Lucey was

7    that although he had subpoenaed the records, the documents

8    back to him, as a way of getting around the agreement he had

9    entered into with previous counsel, he would not be sharing

10   that with other lawyers in this case and the MDL.  That's on

11   the record.  If we're going to consider that, then we should

12   be given the opportunity to review them.

13         MR. LUCEY:  The only documents that had an obligation

14   to return, that had to be subpoenaed, were the documents

15   stamped confidential.  And honestly, I couldn't tell you right

16   now if ten percent of them are stamped or 90 percent of them

17   are stamped.  But at any rate, there are some stamped and

18   there are some that are not stamped.

19         THE COURT:  What about it, Mr. Ouzts?

20         MR. OUZTS:  Your Honor, I'd have to look at the

21   documents.  I thought -- Well, the problem is that the

22   documents were produced in a redacted form.  We redacted

23   privacy information, things like street addresses -- Oh,

24   you're talking about the Tennyson Row documents?

25         THE COURT:  Yeah.

1      MR. OUZTS:  I was not involved in the Tennyson Row

2  case.  I really have no firsthand information about the

3  circumstances of --

4      THE COURT:  Your firm was involved in the Tennyson

5  Row case?

6      MR. OUZTS:  Yes, David Cobb was involved in it, but I

7  personally was not involved in the Tennyson Row case.

8      MS. LUMPKIN:  Your Honor, may we be given the

9  opportunity to review whatever the agreement is between

10  Mr. Lucey --

11      THE COURT:  I assume we'd have to waive the

12  confidentiality order so you can see them, right?

13      MS. LUMPKIN:  If that's the agreement between them

14  regarding the return of documents, because I'm not sure that

15  it only -- they only agreed to return confidential documents.

16  I don't know that.

17      MR. BRYSON:  Your Honor, I don't get it.  You know,

18  in this case, this Johnson case is still part of this MDL.

19  Documents have been produced, they had attorneys.  Mr. -- to

20  Mr. Lucey -- I'm sorry, in the Tennyson Row case, documents

21  were produced by MI, you had attorneys, MI had attorneys, you

22  looked at the documents, he has the documents, I don't see why

23  we can't get the documents now.

24      And I think Your Honor actually addressed this somewhat

25  when they brought this up at our initial status conference,

1    that you were hopeful that we would get the documents sooner

2    rather than later.

3            MS. LUMPKIN:  My recollection of that is that the

4    documents were raised, and we pointed out to the transcript

5    from May, and nothing was addressed further than that.

6        All we're suggesting is we're not saying the documents

7    won't eventually make their way to plaintiffs, because

8    frankly, if they're responsive and it eliminates MI's need for

9    further expense, it would not be an issue.  But we should have

10   an opportunity to review what other counsel in a different

11   State Court case agreed to.

12           THE COURT:  Wait a minute.  Wait a minute.  Other

13   counsel representing your client agrees to something; isn't

14   your client bound by that?

15           MS. LUMPKIN:  Your Honor, yes --

16           THE COURT:  Mr. Cobb was your client's agent.

17           MS. LUMPKIN:  I recognize that may be the case.  The

18   reality is --

19           THE COURT:  What do you mean it may be the case?  It

20   is the case, right?

21           MS. LUMPKIN:  But, Your Honor, Mr. Lucey entered into

22   an agreement in that case with our client's counsel.

23           THE COURT:  It hasn't gone anywhere, and --

24           MS. LUMPKIN:  That's why we'd like the opportunity to

25   review with what that agreement is, and then at least have an

1    opportunity to know what was produced to Mr. Lucey.

2          MR. BRYSON:  Don't you know what was produced?

3          MS. LUMPKIN:  No, I don't.

4          MR. BRYSON:  Did you ask Mr. Ouzts?

5          MS. LUMPKIN:  Mr. Ouzts just said he wasn't

6    involved --

7          THE COURT:  You don't need to -- You know.  It seems

8    like that we're starting to pick at nits, which I understand

9    is important, but if your client, represented by a good lawyer

10   in Mr. Ouzts' firm, agreed to give documents to Mr. Lucey,

11   then you don't get another shot at that.  You can't say, oops,

12   we made a mistake, on behalf of the same client.

13         MS. LUMPKIN:  I understand, Your Honor, but obviously

14   counsel for MI in that case anticipated a need to enter into

15   an agreement with Mr. Lucey requesting that they return the

16   documents.  I don't know why they did that, but there must

17   have been a need either from the client's perspective or

18   counsel's perspective.  Let's get Mr. Cobb to come down here

19   and talk to us about it at the next status conference.

20         THE COURT:  Okay.  Bring him here tomorrow.  Or talk

21   to him at least by tomorrow, all right?  Okay.

22      Anything else?  Thanks a lot.

23

24      (Court adjourned at 3:10 p.m.)

25

1                     REPORTER'S CERTIFICATION

2

3          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4    Reporter for the United States District Court for the District

5    of South Carolina, hereby certify that the foregoing is a true

6    and correct transcript of the stenographically recorded above

7    proceedings.

8

9

10

     S/Debra L. Potocki
11   _____

12   Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25